Filed 3/10/22  P. v. Hemsley CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074782 |
| v. | (Super. Ct. No. FWV19002041) |
| DAVID JEFFERY HEMSLEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Affirmed in part; reversed in part.

Joanna Lynn Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Teresa Torreblanca and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

James M. believed defendant and appellant David Hemsley was having an affair with his girlfriend.  The two men engaged in a fistfight, leading to defendant firing two shots at James, one of which hit him in the chest.

Defendant appeals from judgment entered following jury convictions for unlawful possession of a firearm by a felon (Pen. Code, § 29800, subd. (a); count 2)[1], unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3), and assault with a semiautomatic firearm (§ 245, subd (b); count 4).  The jury also found true allegations that defendant personally used a firearm and inflicted great bodily injury (GBI) in the commission of the assault (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.7, subd. (a)).  The jury also found that defendant had a prior burglary conviction, which qualified as a strike and a prior serious felony enhancement (nickel prior) (§§ 667, subd. (a)(1), 1170.12).  The jury acquitted defendant of making a criminal threat (§ 422, subd. (a); count 1).  The court sentenced defendant to a determinate prison term of 26 years eight months.

Defendant contends the trial court committed instructional error by not sua sponte giving the jury a unanimity instruction on the assault charge, and by not giving CALCRIM No. 306 regarding the prosecution's loss of photographs of defendant's injuries.  Defendant further contends he was denied a fair and impartial trial when James,

_____

[1] Unless otherwise noted, all statutory references are to the Penal Code.

2

unprompted, showed the jury his post-surgery scar from defendant shooting him. Defendant also asserts the trial court abused its discretion in allowing James to testify regarding the emotional impact of his injuries. As to sentencing, defendant contends the trial court abused its discretion in denying his *Romero*[2] motion to strike his 1989 prior serious felony strike; the court erred in concluding it lacked discretion to strike defendant's nickel prior under section 1385; and the court erred under section 654 in imposing separate sentences for defendant's convictions for unlawful possession of a firearm and possession of ammunition.

We conclude that, although James improperly showed the jury his scar, his conduct was not prejudicial error. We also conclude the trial court erred in allowing James to testify regarding the emotional impact of his scar on him. The testimony was irrelevant but not prejudicial error. We reject defendant's other trial-related objections and his cumulative error contention.

As to sentencing, we reject defendant's challenge to the trial court denying his *Romero* motion, but agree, as do the parties, that the trial court erred in not exercising its discretion to strike defendant's nickel prior under section 1385. We also agree, as do the parties, that the trial court erred in not staying defendant's sentence on count 3 under section 654.

The judgment of conviction is therefore affirmed but defendant's sentence is reversed with directions the trial court stay his sentence on count 3 under section 654.

---

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

3

On remand, the trial court is directed to exercise its discretion regarding whether to strike defendant's nickel prior under section 1385.

## II.

## FACTS

Dwight B. and Kimberly L. lived with their two children in an upstairs apartment, which had a loft. A stairwell inside the apartment led to the loft. Defendant rented the upstairs loft from Dwight. During the afternoon of June 29, 2019, Dwight and Kimberly were sitting on their patio balcony. Defendant was in his loft room. Dwight saw James at the door. Dwight told James to let himself in. Unbeknownst to Dwight, James and Kimberly had been having an affair for several years. James told Dwight he wanted to talk to defendant because he believed defendant had been "messing around" with his girlfriend for a few months. James looked angry and mentioned defendant's name while cussing.

James went upstairs to the loft, knocked on defendant's door, identified himself, and said he needed to talk. Defendant opened the door and let him in. Defendant then "grabbed ahold of [him] and pulled [him] down." James acknowledged he is 220 pounds and defendant is 150 pounds. When defendant used the door to try to push James out of the loft, James swung at defendant and then punched defendant in the face. The two men scuffled on the ground for about a minute.

James testified he stopped fighting and said, "That's enough," because he got tired. He had lung cancer. Defendant asked him what he was doing. James told

4

defendant he thought defendant was "messing around" with Kimberly.  James stood up and started to quickly walk toward the door to leave.  James testified that when he got to the bottom of the loft stairwell, defendant said, "'Motherf—er, I'll shoot you.'"  James turned and looked back at defendant.  Defendant was holding a gun and coming after James.  As James was headed for the bottom of the stairs, defendant shot him in the rib area of his back.  Defendant was six to eight feet away, starting to come down the stairs from the loft when he fired at James.

James testified that after he was shot, he opened the apartment door and leapt and stumbled down the outside stairs.  When he was almost to the bottom, he heard a second shot, which hit the stairs near him.  James exclaimed, "'Oh, this dude's trying to kill me.'"  James ran to nearby bushes and yelled to a neighbor to call 911 because he had been shot.  James thought he was going to die.

James acknowledged he had a criminal history, which included convictions for criminal threats in 1997 and burglary in 1996 and 2010.  James stated he did not know defendant.  He only knew of him.  James did not know defendant had a gun and did not think defendant would shoot him.

Dwight, who remained downstairs during the incident, testified he heard James ask, "'What are you doing messing with my girl?'"  Defendant replied, "Who?"  James responded, "'Kimberly.'"  Dwight then heard what sounded like a fight, with punching and rolling around on the floor.  The scuffling lasted for about 30 or 45 seconds.  While

5

Dwight was still on his patio downstairs, he saw James leaving and saw defendant with a gun. Defendant's face was bloody.

As James went out the front door, defendant followed him. Dwight did not see James stop, wait for defendant, swing at him, wield a weapon, or attack defendant. James was trying to get to the door and then exited the apartment. James got to the front door before defendant. When defendant got there, he fired his gun out the door at James. Dwight remembered hearing only the one shot, after which defendant turned around and came back inside the apartment. Defendant's nose was bloody. He appeared upset and angry at James, and still had a gun. After a minute or two, defendant calmed down and left. Dwight looked out the window and saw James with Kimberly. He was laying down on the grass, yelling, "'I'm shot. I'm bleeding.'"

Police Detective Chinnis arrived on the scene. He found a spent shell casing on the carpet about three or four feet from the bottom of the stairs leading to the loft. He found in the loft a gun holster on the ground five feet from the door. There was blood on a wall or door of the loft, blood on the stairs leading to the loft, and blood near the threshold of the door leading outside the apartment. Detective Chinnis found a second casing downstairs, outside the apartment, directly below the scene. Detective Chinnis believed that one shot was fired inside the apartment and another shot was fired outside.

An hour later, Detective Chinnis pulled over defendant in his car and detained him. Defendant had a loaded semiautomatic pistol under his thigh. The gun magazine

6

could hold eight cartridges. There were only five in the magazine and one chambered bullet.

When Detective Chinnis interviewed James at the hospital two days later, James said he went to the apartment to talk to his "old lady." James later testified that he went over to confront defendant.

The trauma surgeon who treated James testified the bullet entered James's right side near his back and made a hole in James's heart. The surgeon removed the bullet from James's diaphragm and repaired the hole in his heart. In standard hospital tests, James tested positive for methamphetamine and benzodiazepine.

During a recorded interview at the police station, defendant stated James ran away when he saw defendant get his gun. Defendant did not see James with a weapon. Defendant said that when he fired the first shot, he was trying to hit James, and fired the second shot while James was fleeing because defendant did not know if the first shot hit him.

Defendant testified that, while being transported to the station, he said, "'It's been a bad day,'" and "'In a moment, you become the bad guy.'" Defendant said he was talking about himself and that he had a gun when he was not supposed to have one. Defendant denied that he was referring to being a bad guy because he had just shot someone. Defendant testified that he wanted to shoot James "'in the heat of the f—ing moment,'" in anger, because James beat him up for no reason. He was not sleeping with Kimberly.

7

Defendant said he heard kicking or pounding on the loft door. Before going to the door, defendant put his gun in his waistband. While defendant was unlocking the door, James broke open the door, pushing defendant backwards, and attacked defendant. While defendant was on the ground, on his back, James kicked and stomped on him. Defendant grabbed his gun and pointed it at James. James headed toward the loft door. James and defendant quickly headed down the stairs four or five feet apart. At the bottom, James turned towards defendant and said to defendant, "'F—k you. You're not going to shoot me.'"

Defendant testified he shot James because he was in fear for his life when James turned toward him. After firing at James the first time, James moved toward the door and exited the apartment. Defendant followed him to the door. Defendant did not realize he fired a second shot. Everything happened "really, really quick." It was only a couple of minutes between when James banged on defendant's door and when defendant fired his gun. After James went outside, defendant left in his car. After about an hour, law enforcement found him and he surrendered. Defendant stated he got the gun three months before because he was 60 years old[3] and had been threatened. He said he had never fired a gun before.

---

[3] Defendant was 58 years old at the time of the charged offense.

III.

UNANIMITY INSTRUCTION

Defendant contends the court committed prejudicial error by not sua sponte giving the jury a unanimity instruction.  Defendant argues the trial court was required to instruct the jury that it had to agree on which of the two shots defendant fired at James constituted the assault.  We disagree.

"We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law."  (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850.)  "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)  Here, the prosecutor did not elect which shot constituted the charged assault.

There are several exceptions to this general rule.  The People argue the continuous-course-of-conduct exception and same-defense exception apply here.  The continuous-course-of-conduct exception "arises 'when the acts are so closely connected in time as to form part of one transaction.'"  (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679, quoting *People v. Crandell* (1988) 46 Cal.3d 833, 875.)  The same-defense exception arises when "the defendant offers the same defense or defenses to the various

9

acts constituting the charged crime." (*People v. Jennings*, *supra*, at p. 679.)  Defendant argues that neither of these exceptions applies.

"[T]he continuous-course-of-conduct exception applies when (1) 'the acts are so closely connected in time as to form part of one transaction,' (2) 'the defendant tenders the same defense or defenses to each act,' and (3) 'there is no reasonable basis for the jury to distinguish between them. [Citations.]' [Citation.]  'This exception "'is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." [Citation.]' [Citation.]" [Citation.]' [Citation.]  Again, however, it is not at all clear that this is truly an *exception*. It would seem more accurate to say that, in this situation, a unanimity instruction is required, but the failure to give one is harmless.  (See *People v. Arevalo–Iraheta* (2011) 193 Cal.App.4th 1574, 1589  ['the omission of a unanimity instruction [is] harmless if the record reveals "no rational basis . . . by which the jury could have distinguished between [the acts which would constitute the offenses]"'].)"  (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196.)

Defendant asserts that the continuous-course-of-conduct exception does not apply because he fired two shots, the first of which hit James while inside the apartment. Defendant argues he fired the second shot as James was running away from defendant toward the front door or was running out the door.  The second shot did not hit James.

Defendant argues he acted in self-defense when he fired the first shot at James, in response to James beating him up.

Defendant further argues that the jury could have found that, when defendant fired the second shot at James and missed, defendant was no longer acting in self-defense and the shooting was therefore a separate incident. Defendant notes that the prosecutor stated in her closing rebuttal argument: "This is a story of two incidents—of a fistfight that took place in a room—that had ended— and a shooting that took place when someone was on their way out." Defendant therefore argues the unanimity instruction was required because neither the continuous-course-of-conduct exception nor the same defense exception applies.

But the prosecutor's closing argument distinguishes between the fistfight in the loft and defendant shooting his gun, not between each shot defendant fired. Also, defendant argued in the trial court that he was acting in self-defense when he fired both shots. In addition, defendant acknowledges in his appellant's opening brief that, although he may have acted in self-defense only as to the first shot, "[t]he entire incident happened quickly, and the shots were fired within seconds of each other as the two headed down the stairs and towards the front door. [Defendant] testified he did not know if the first shot struck so he fired again." We conclude there was little, if any, evidence supporting a finding that defendant's conduct was anything other than a continuous course of conduct. There was no reasonable basis for the jury to distinguish between defendant firing the first and second shots. Both the testimony of James and defendant establish that the

11

incident occurred when James accused defendant of being involved with his girlfriend, the men engaged in a fistfight, defendant pulled out his gun, James fled, and defendant fired at James twice within seconds, with only the first shot striking James. Therefore, under the continuous-course-of-conduct exception, a unanimity instruction was not required.

Furthermore, even if the trial court erred in not giving a unanimity instruction, any such error was harmless. The jury's finding true the GBI enhancement on the assault count demonstrates that the jury unanimously rejected defendant's self-defense testimony and also unanimously found that defendant assaulted James when he fired the first shot at James.

Defendant asserts that the jury could have found the GBI enhancement allegation true but not unanimously find true the assault charge based on the first shooting. Defendant argues the jury could have found that the assault with a semiautomatic firearm consisted of a continuous course of conduct which included both shootings. Therefore, the jury could have found the GBI enhancement was based on the second shooting.

We are not persuaded by this argument. When instructing the jury on the GBI enhancement, the court told the jury that "[i]f you find that the defendant [is] guilty of the crime charged in Count 4, assault with a semiautomatic firearm . . . you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on James [] in the commission of that crime." It is presumed

12

the jury properly followed the court's instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

It was sufficiently clear that to find the GBI allegation true the jury was required unanimously to find that defendant personally inflicted GBI on James.  The only shot fired that caused such harm was the first shot.  Therefore, the jury's finding true the GBI enhancement demonstrates the jury also unanimously found true that defendant assaulted James when he fired the first shot.  If a juror believed that defendant acted in self-defense at the time of the first shot, then there would have been no true finding on the GBI enhancement.  This is because the jurors were instructed that they had to first find defendant assaulted James when committing the GBI.  We therefore conclude that the jury unanimously found defendant guilty of assault with a semiautomatic firearm based on the first shot.  Therefore, even if there was error in not giving a unanimity instruction, such error was harmless.  (*People v. Lueth*, *supra*, 206 Cal.App.4th at p. 199; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188.)

IV.

CALCRIM. NO. 306

Defendant contends the trial court committed prejudicial error in rejecting his request that the court give CALCRIM No. 306 as a sanction for the prosecution's failure to produce cell phone photographs of defendant's facial injuries.  CALCRIM No. 306 states in relevant part:  "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law.  Failure to follow this rule

13

may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.  [¶]  An attorney for the (People/defense) failed to disclose:  <describe evidence that was not disclosed>. . . ."

A. *Procedural Background*

After detaining defendant, Police Detective Sutton used his cell phone to photograph defendant's facial injuries.  Defense counsel requested the photographs but the prosecution did not produce them.  The prosecutor said she made a blanket request for photographs and received photographs but not the ones Detective Sutton took of defendant.

At trial, Detective Chinnis was shown still-shots from the surveillance camera inside the interview room.  The photographs showed Detective Sutton taking photographs of defendant's face with his cell phone.  Detective Chinnis testified that the cell phone photographs Detective Sutton took of defendant's face were taken to document his injuries but neither Detective Chinnis nor Detective Sutton could locate the photographs.

During a chambers conference on jury instructions, defense counsel requested CALCRIM No. 306 because the prosecution failed to provide the cell phone photographs of defendant.  Defense counsel argued the lost photographs were important because they were the best evidence of defendant's facial injuries.  They were close-up photographs of defendant's facial injuries, which supported defendant's version of what happened and revealed the extent of his injuries.

14

The prosecutor objected to the instruction as unnecessary. She argued that she provided defense counsel with defendant's booking photograph which showed what he looked like right after the incident. The prosecutor also provided still photographs from a video of defendant's interview, which also showed defendant's condition. Defense counsel argued the booking photograph was not a good photograph because it was "grainy" and the still photographs were taken after defendant was released from the hospital. Defense counsel requested CALCRIM No. 306 as a minimal sanction for the prosecution's mishandling of the cell phone photograph evidence. The court took the matter under submission.

During a subsequent hearing on whether to give CALCRIM No. 306, the court stated that the instruction should be given if the failure to provide the discovery was a prejudicial violation of the discovery statute to produce relevant discovery. The court noted the parties agreed the photographs were either destroyed or lost. The court considered whether the loss of the photographs was prejudicial, noting other photographs depicting defendant's injuries were produced and were used by the defense. The defense would have also been able to show the severity of defendant's injuries by calling defendant's treating physician to testify. The court therefore denied giving CALCRIM No. 306 on the ground there was no prejudicial violation of the discovery statute.

B. *Discussion*

Section 1054.1 requires the prosecution to "disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the

15

prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] . . . [¶] . . . [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] . . . [¶] [and] (e) Any exculpatory evidence."

Section 1054.5, subdivision (b) provides in relevant part that, "[u]pon a showing that a party has not complied with [s]ection 1054.1 . . . and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court *may advise the jury of any failure or refusal to disclose* and of any untimely disclosure." (Italics added.) Section 1054.5, subdivision (b) indicates that advising the jury of any failure or refusal to disclose evidence is discretionary, not mandatory.

Defendant asserts that, when ruling on the instruction, the trial court cited the Bench Notes for CALCRIM No. 306, which state: "While the court has discretion to give an instruction on untimely disclosure of evidence (Pen. Code, § 1054.5(b)), the court should not give this instruction unless there is evidence of a prejudicial violation of the discovery statute." Defendant argues that the trial court's reliance on the Bench Notes was erroneous because the prejudice requirement only applies to a discovery violation by the defense, not the prosecution. But the record does not show that the trial court cited

16

the Bench Notes or stated it was relying on them when rejecting CALCRIM No. 306. Defendant merely assumes this based on the court stating it was denying the instruction because there was no prejudice caused by the loss of the photos.

Although a finding of prejudice may not be required when giving CALCRIM No. 306 based on a discovery violation committed by the prosecution, the trial court's denial of CALCRIM No. 306 based on such a finding was a reasonable exercise of discretion. The trial court reasonably found defendant was not prejudiced by the prosecution losing the photographs because other evidence was available to show defendant's facial injuries, including still-shots taken during defendant's videotaped interview, medical unit photographs taken during treatment of his injuries at the hospital, and his booking photograph.

While these photographs may not have been as vividly graphic, close up, or as close in time to the incident as the cell phone photographs, the photographs produced at trial of defendant's injuries, along with defendant's testimony describing his injuries, provided an alternative means of effectively showing the jury his facial injuries. Defendant also had the option of providing testimony by his treating physician, describing the severity and nature of his injuries. Even without the cell phone photographs, there was more than sufficient evidence available to convey to the jury the nature and severity of defendant's facial injuries.

17

Under section 1054.5, subdivision (b), giving CALCRIM No. 306 is discretionary, and the trial court reasonably found there was no reason to give the instruction where there was a lack of prejudice and no showing the discovery violation was intentional.

Furthermore, even if there was error in not giving CALCRIM No. 306, it was harmless error. The standard of review for erroneous failure to give a jury instruction is "the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393; see *People v. Dickey* (2005) 35 Cal.4th 884, 905.)

Here, it is not reasonably probable the jury would have reached a result more favorable to defendant had the court given CALCRIM No. 306. The instruction merely would have informed the jury that the prosecution did not produce the photographs. That information was already conveyed to the jury through Detective Chinnis's testimony that Detective Sutton had taken photographs of defendant's face, but the photographs were missing.

V.

DISPLAY OF VICTIM'S SCAR TO THE JURY

While James was on the witness stand, waiting for defense counsel to resume cross-examination, he improperly attempted to show the jury his post-surgery scar from his gun wound. Defendant contends James's unsolicited display of his scar constitutes an irrebuttable presumption of prejudice, which requires a new trial. We disagree.

18

A. *Procedural Background*

During direct examination, James asked if he could show the jury his scar from surgery for his gunshot injury. The prosecutor indicated he could later. James then testified regarding defendant shooting him and the nature and location of his injuries.

While the court and attorneys engaged in a bench conference, James gestured to the jury in an attempt to show them his post-surgery scar on his chest. The following day, out of the presence of the jury, the court told counsel that the court had been informed that the day before, during the bench conference, James had attempted to show the jury his scar. Defense counsel told the court that people in the audience also told him that had occurred. The court stated that it was going to admonish James regarding his behavior on the witness stand. The prosecutor stated she was unaware of James's conduct. She noted that she had been planning to ask the court to allow James to show the jury his injuries anyway. She requested the court to allow her to do so. The court agreed to the prosecutor's request.

Out of the presence of the jury, the court admonished James on proper conduct when testifying, noting that it had come to the court's attention that during a bench conference, James had attempted to draw the jury's attention to his injuries. James stated this was true. The court explained this was improper conduct because he was not to show evidence to the jury on his own when no questions were pending.

Upon resuming James's testimony, the prosecutor and defense counsel questioned him regarding his scar. Defense counsel asked him if he had shown the jury his scar

19

while counsel and the court were engaged in a bench conference. James said he did because he was frustrated with defense counsel's questions and wanted the jury to see his scar. On redirect, the prosecutor also asked James if he had tried to show the jury his scar. James said he did, and acknowledged he was upset about his scar because it looked "ugly" and made him "look terrible." It also still hurt. The prosecutor asked the court to allow James to show the jury his scar in accordance with proper procedures, which the court permitted. James pointed to his scar, which ran from the base of his neck, down to his belly button. After James testified, his treating physician testified in graphic detail regarding James's injuries and treatment.

B. *Forfeiture*

The People agree that James's unprompted display of his scar was improper witness conduct. However, the People argue defendant forfeited his objection by not objecting and by not requesting a jury admonition or requesting a mistrial. We agree. Defendant forfeited this claim by failing to object in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 354 ["only those claims properly raised and preserved by the parties are reviewable on appeal"]; *People v. Geier* (2007) 41 Cal.4th 555, 609-611 [the defendant's failure to object forfeited constitutional claims where they were not of such magnitude that an exception to forfeiture was warranted].)

When counsel is aware of the court's response to misconduct at or before the time it was effected, "'[t]acit approval' of the court's response, or lack of response, may be found." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.) Tacit approval may be

found "where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. [Citation.] At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal. [Citation.]" (*Ibid.*)

Here, at its earliest opportunity, the trial court informed the parties of James's inappropriate attempt to display his scar, discussed the matter with counsel, and proposed measures to address the incident, including admonishing James and allowing the parties to question him about his scar and his improper attempt to display it to the jury. Defense counsel had a meaningful opportunity in the trial court to object to James's conduct and the court's manner of addressing the incident, yet failed to do so, and failed to request any additional or alternative ameliorative measures.

Defendant argues the issue was not forfeited because it concerns a constitutional violation which this court can consider any time. But even though defendant is asserting that the evidentiary error violated his constitutional right to an unbiased jury, the misconduct is not of such magnitude that an exception to the forfeiture rule is warranted. James's inappropriate conduct resulted in improperly disclosing evidence that was later properly admitted into evidence. In addition, the court took proper ameliorative measures to minimize any jury bias. (*People v. Geier* (2007) 41 Cal.4th 555, 609-611.)

Furthermore, defendant gave "tacit approval" of the court's response, or lack of response to the improper evidence. (*People v. Ross*, *supra*, 155 Cal.App.4th at p. 1048.) Defendant and his attorney were well aware of the evidentiary issue during the trial and

were aware of the court's response at or before the time it was effected. Defense counsel had ample opportunity to request ameliorative measures; to object to the court's measures taken in response to the misconduct; and to request a mistrial. Defense counsel did none of these things. Defendant therefore forfeited his objections to the unsolicited scar evidence and tacitly approved of the trial court's responsive measures.

In any event, defendant cannot establish the prejudice requisite for relief. It is not reasonably probable that a result more favorable to him would have resulted had the misconduct not occurred or had the court taken additional ameliorative measures.

C. *Prejudice*

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, *deemed presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (*Remmer v. U.S.* (1954) 347 U.S. 227, 229, italics added; see *People v. Harris* (2008) 43 Cal.4th 126, 1304.)

The court in *People v. Nesler* (1997) 16 Cal.4th 561, 579, elaborated on this general rule: "Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless

22

gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut."

Although James's misconduct did not occur outside the courtroom, it was a form of unsolicited improper communication with the jury occurring while the court and counsel were preoccupied with other matters. Unsolicited actions by a witness may be characterized as improper witness testimony, which may result in a mistrial or reversal on appeal if prejudicial. (*People v. Ledesma* (2006) 39 Cal.4th 641, 681-684.) A witness's volunteered statement or unprompted conduct can provide the basis for a finding of incurable prejudice. (*People v. Wharton* (1991) 53 Cal.3d 522, 565.)

Defendant argues James's improper, unsolicited conduct of showing his scar to the jury caused prejudicial, undue jury bias. But the jurors are not required to ""be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion *and render a verdict based on the evidence presented in court*."' [Citations.]" (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 580-581) Defendant argues that James's improper display of his scar caused prejudicial jury bias because it reinforced the serious harm defendant inflicted on James and had the inflammatory effect of causing the jury to sympathize with James, a key witness testifying against defendant.

Even though the jury saw James's scar twice, instead of only once, it is highly unlikely that defendant suffered actual harm or prejudice. Before James improperly showed the jury his scar, he testified defendant shot him in the chest and mentioned he

had a scar.  James described in detail the nature and location of his injuries, which were undisputed.  James's treating physician also testified in graphic detail regarding James's injuries and treatment.  In addition, the prosecutor informed the court that, even before James improperly attempted to show the jury his scar, she had intended to request the court to allow James to show the jury his scar, and the trial court permitted him to do so.  The jury would have seen the scar even if James had not improperly displayed it.

We reject the proposition that the jury was incapable of disregarding James's misconduct and rendering a verdict based solely upon the evidence properly received at trial, which included James displaying his scar under proper evidentiary procedures.  (*People v. Nesler*, *supra*, 16 Cal.4th at p. 583.)  In addition, any likelihood of bias caused by the misconduct was sufficiently diminished by the court's measures taken to minimize bias and conduct a fair trial.  Defense counsel had an opportunity to confront James regarding his scar, cross-examine him, and rebut any information James provided regarding his injuries.  His treating physician also testified.  Because the People rebutted any presumption of prejudice from James improperly showing the jury his scar, we conclude James's misconduct does not constitute prejudicial  error.

## VI.

## VICTIM IMPACT TESTIMONY

Defendant contends the trial court abused its discretion in allowing James to testify regarding the impact of defendant's assault on him.  Defendant argues James's testimony regarding the physical and emotional impact of the shooting were irrelevant.

24

The People argue James's testimony about his injury was relevant to the GBI allegation. The People further assert that, even if James's testimony regarding the physical and emotional impact of his injury was irrelevant, it was harmless error to allow the testimony.

During the trial, the prosecutor asked James if he had been trying to show the jury his scar. James said he did. When asked if his scar upset him, defense counsel objected on relevance grounds, and the court permitted James to respond. James said he was upset about his scar because it looked "ugly" and made him "look terrible." It also still hurt. James said he saw it every day. When he saw it, he felt a little scared and asked himself why he had the scar. James said he had it because of defendant. James added that, because of the incident, he had become more upset and fearful of someone following him, trying to get him. The prosecutor asked James if he feared defendant. The court sustained defense counsel's objection on relevance grounds. James said he feared defendant when he shot James, because defendant was trying to kill him. James testified he continued to fear defendant days after the incident, including while he was in the hospital.

The trial court did not abuse its discretion in allowing James's testimony regarding his physical injury and treatment because it was relevant to the issue of whether he sustained GBI. (Evid. Code, § 350 [only relevant evidence is admissible]; Evid. Code, § 210 [relevant evidence must tend to prove or disprove a material disputed fact]; *People v. Redd* (2010) 48 Cal.4th 691, 731.) James's testimony was also relevant to the criminal

25

threat charge, to the extent he experienced sustained fear of defendant after defendant threatened to kill him and fired at him. James's testimony regarding being upset about his scar, however, was irrelevant and thus inadmissible. Nevertheless, allowing the testimony was harmless error. (*People v. Redd*, *supra*, at p. 732.)

Defendant argues that James's impact testimony was prejudicial because it evoked sympathy for James, who was a key witness. But James's testimony that his scar was "ugly," "bothered" and upset him when he saw it every day, and raised feelings of fear of being harmed, was brief and not likely to have influenced the jury in deciding the charges. James described normal feelings in response to such an injury, which the jury likely would have assumed he experienced even in the absence of James's testimony. In addition, the court instructed the jury not to be influenced by bias or sympathy when deciding the charges. It is presumed the jury properly followed the court's instructions. (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.) It is thus not reasonably probable that the outcome would have been more favorable to defendant had James not testified regarding the emotional impact on him of his injuries and scar. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Redd*, *supra*, 48 Cal.4th at p. 732.)

VII.

CUMULATIVE ERROR

Defendant contends that, even if the asserted errors were not individually prejudicial, their cumulative effect constitutes reversible prejudicial error. Defendant argues the repeated improper focus on his injuries was prejudicial error. We disagree.

26

The only errors or misconduct committed during the trial were (1) James's displaying his scar to the jury unprompted and (2) the court allowing James to testify regarding the emotional impact of his scar. But even without this evidence, the outcome would have likely been the same. The jury was informed of the seriousness of James's injuries by other evidence. James's display of his scar twice, instead of once, and briefly mentioning the emotional impact of his scar added little to the existing evidence.

In considering a claim of cumulative error, we must consider whether defendant received due process and a fair trial, and whether any cumulative error contributed to the verdict. (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; *People v Mora and Rangel* (2018) 5 Cal.5th 442, 499; *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Woods* (2006) 146 Cal.App.4th 106, 117.) A predicate to a claim of cumulative error is a finding of multiple errors, which when considered collectively, are prejudicial. (*People v Mora and Rangel*, *supra*, at p. 499; *People v. Rogers* (2006) 39 Cal.4th 826, 911.) We conclude that defendant received due process and a fair trial. To the extent any errors occurred, individually or cumulatively, none were prejudicial under state or federal law. (*People v Seumanu* (2015) 61 Cal.4th 1293, 1317; *Chapman v. California*, *supra*, 386 U.S. at p. 24 [beyond a reasonable doubt the error did not contribute to the verdict]; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [it is not "reasonably probable that a result more favorable to the appealing party would have been reached."].)

VIII.

*ROMERO* MOTION

Defendant contends the trial court abused its discretion and violated his right to due process by denying his *Romero* motion to strike his 30-year-old burglary conviction. Defendant argues the trial court's denial of the motion based on finding continued criminality was not supported by substantial evidence. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 994.)

A. *Background*

The sentencing probation report stated that defendant, who was 58 years old at the time of sentencing, had several misdemeanors in the late 1980s and committed first degree burglary in 1988, in his early 20s. Defendant pled no contest to the 1988 charge. The court granted defendant probation, which was revoked for commission of theft in 1989. Defendant was sentenced to prison and paroled in 1991. He was not convicted of any other crimes until his conviction in 2018, for transportation of a controlled substance. (Health & Safety Code, § 11379.) At the time of the charged offense in this case, defendant was on mandatory supervision for the drug-related offense.

Defendant attached to his *Romero* motion public defender investigation reports summarizing interviews of defendant's former wife and one of his stepdaughters. The reports state that after defendant's 1989 conviction, he met his former wife in 1994, they married in 1997, and they had a son. Defendant's ex-wife and stepdaughter stated during their interviews that defendant worked hard and provided a home for his family,

28

including his three stepdaughters, but he started drinking, which led to his decline and divorce in 2012.

The probation department reported that during defendant's interview in January 2020, defendant said that he had no regrets for possessing a gun during the charged offense. Defendant reportedly told the probation officer that, despite his criminal record, he strongly believed that he should have a right to bear arms and defend himself under the constitution. He further stated that, other than his drug-related conviction in 2018, he had not violated the law since he was discharged from parole in 1991. Defendant said that his 1989 burglary conviction was for entering his parents' home without consent and taking a stereo, with the intent to use it to purchase drugs. Defendant admitted to recreational methamphetamine use, and stated he last used methamphetamine and marijuana shortly before his arrest for the charged assault offense. Defendant denied his drug use interfered with his finances or limited his ability to maintain a law-abiding lifestyle.

Defendant testified that he brought his gun to the door in response to James pounding loudly on the door to his room. Defendant acknowledged that he was aware that because he had a prior felony conviction, it was illegal for him to possess a gun and ammunition. Defendant testified that he nevertheless had a gun to protect himself. He acquired the gun about three months before the charged offenses because he had been threatened in a matter unrelated to the charged offenses.

Defendant filed a *Romero* motion, requesting the court to strike his 1989 burglary conviction. During the sentencing hearing, the court stated it had reviewed the probation report. Defense counsel argued the incident was an unusual situation not likely to be repeated, in which defendant did not initiate the offense and used a gun to protect himself. James unexpectedly confronted defendant. Defense counsel argued the case was close and defendant's 1989 conviction was very old. Because it was so old, the trial court did not permit it to be used at trial for impeachment purposes. In addition, defense counsel argued that after defendant's release in 1991, defendant reformed. He ran his own business and raised a family. He did not have any convictions until his 2018 conviction for transporting controlled substances for sale.

The prosecutor argued against striking defendant's prior because defendant had no remorse. The probation officer reported that "'[h]e admitted to being in possession of a firearm. And for that, he has no regrets.'" The prosecutor argued defendant did not think shooting James was wrong and did not think his use of methamphetamines limited his ability to maintain a law-abiding lifestyle. The prosecutor therefore believed there was a real possibility that defendant would do the same thing again.

After hearing oral argument on the motion, the court acknowledged the 1989 burglary conviction strike was "old." The court stated that, "if it was only that strike that was on his criminal record, the Court would consider or look more favorably towards striking the strike." However, defendant also had a 2018 felony conviction and was on

30

mandatory supervision when he committed the charged offenses. The court concluded defendant therefore knew "full well that he was not to be in [] possession of any firearm."

The court acknowledged defendant's contention he reformed himself after his 1989 conviction but concluded that, "based on his attitude about firearms and despite the laws that prohibit him from possessing a firearm—has continued to possess a firearm. And I don't consider that being law-abiding behavior. I know that the defendant says that he obtained that firearm shortly before the incident; based on his statements, I don't doubt that—I very much doubt that." The court stated it was therefore denying defendant's *Romero* motion to strike his 1989 conviction "[b]ased on the defendant's conduct that he was a felon on mandatory supervision, he continued to carry firearms, and because of him carrying a firearm in this case, [and] a person was seriously injured or almost killed."

B. *Applicable Law*

Section 1385, subdivision (a), authorizes a trial court to strike prior conviction allegations and/or findings in cases brought under the "Three Strikes" law. (*Romero*, *supra*, 13 Cal.4th at pp. 529-530.) However, a "court's discretion to strike prior felony conviction allegations in furtherance of justice is limited." (*Id*. at p. 530.) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present

31

felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

"While a court must explain its reasons for striking a prior (§ 1385, subd. (a); see *Romero*, *supra*, 13 Cal.4th [at p.] 531), no similar requirement applies when a court declines to strike a prior (*People v. Carmony*, *supra*, 33 Cal.4th 367, 376). 'The absence of such a requirement merely reflects the legislative presumption that a court acts properly whenever it sentences a defendant in accordance with the three strikes law.'" (*In re Large* (2007) 41 Cal.4th 538, 550.) "Only extraordinary circumstances justify finding that a career criminal is outside the Three Strikes law." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140.) The defendant must "rebut the 'strong presumption' (*People v. Carmony*, *supra*, 33 Cal.4th [at p.] 378) that the trial judge properly exercised his discretion in refusing to strike a prior conviction allegation." (*In re Large*, supra, 41 Cal.4th at p. 551.)

C. *Discussion*

Defendant argues that the trial court improperly denied his *Romero* motion based on speculation that he had illegally possessed a gun for many years and therefore had engaged in continued criminality. Applying the deferential abuse of discretion standard of review and strong presumption that the trial judge properly exercised his discretion in

32

refusing to strike a prior conviction allegation, we conclude defendant has not demonstrated the trial court erred in denying his *Romero* motion.

Although the trial court was not required to state its reasons for denying the *Romero* motion, the court stated sufficient grounds. Defendant's statements to the probation officer, along with his conduct, demonstrated that he believed he had a right to possess a gun under the constitution, he had knowingly unlawfully possessed a gun in the past, and he likely would unlawfully possess a gun in the future, even though he knew doing so was illegal. Even though defendant had been a felon since 1989 and was on mandatory supervision for a felony conviction in 2018, he knowingly unlawfully possessed a gun at the time of the charged offense. In addition, defendant did not demonstrate any remorse for illegally possessing or using the gun, which seriously injured James. The trial court reasonably concluded that, based on defendant's charged offenses, his stated attitude toward possessing firearms illegally, and his lack of remorse for possessing the gun he used to shoot James, defendant demonstrated probable continuing criminality, of unlawfully possessing a gun in the future.

The record shows that the court did not deny defendant's *Romero* motion solely based on a finding defendant had possessed the gun used in the charged crime for a lengthy period of time. Rather, the court based its ruling on several proper factors demonstrating that defendant continued to show a disregard for the law, particularly when it came to possessing firearms. The court's denial of defendant's *Romero* motion was not based solely on speculation. The court's stated reasons for denying the motion

33

were well within the realm of reason.  Defendant thus has not met his burden of clearly showing "that the sentencing decision was irrational or arbitrary."  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)  The nature and circumstances of defendant's present felonies and his prior felony convictions, as well as the particulars of his background, character, and prospects, justify the trial court's decision to deny defendant's *Romero* motion.  (*People v. Williams*, *supra*, 17 Cal.4th at p. 161.)

IX.

IMPOSING PRIOR SERIOUS FELONY ENHANCEMENT

Defendant contends the trial court erroneously believed it did not have discretion to strike defendant's prior serious felony conviction (nickel prior) under section 1385, subd. (b).  Defendant asserts, and the People agree, as does this court.  This matter must therefore be remanded to allow the trial court to exercise its discretion to strike defendant's nickel prior under sections 1385, subdivision (b), and 667, subdivision (a)(1).

On September 30, 2018, the governor approved Senate Bill No. 1393 (2017-2018 Reg. Sess.), allowing a trial court to dismiss a prior serious felony enhancement in furtherance of justice.  (*People v. Stamps* (2020) 9 Cal.5th 685, 693; § 1385, subd. (b).)  "Senate Bill [No.] 1393 removed provisions that prohibited a trial court from striking a serious felony enhancement in furtherance of justice under section 1385."  (*People v. Stamps*, *supra*, 9 Cal.5th at p. 700.)  After Senate Bill No. 1393 became effective on January 1, 2019, the trial court sentenced defendant on February 22, 2020.

34

As to defendant's count 4 conviction for assault with a semiautomatic firearm, the court stated it intended to impose a five-year, consecutive sentence enhancement for defendant's nickel prior (§ 667, subd. (a)(1)). Defense counsel countered that under the recently amended law, the trial court had discretion to stay the nickel prior. After reviewing section 667, subdivision (a)(1), the court denied defense counsel's request, concluding the court had no discretion and was therefore required to impose the five-year nickel prior.

Because the trial court did not indicate whether it would have declined to strike the enhancement if it had discretion to do so, this matter should be remanded to the trial court to exercise its discretion whether to strike the nickel prior under section 1385, subdivision (b). If the court on remand declines to strike defendant's nickel prior under section 1385, that ends the matter and defendant's sentence shall stand. (*People v. Stamps*, *supra*, 9 Cal.5th at p. 707.)

## X.

## STAYING SENTENCE ON COUNT 3

Defendant contends, and the People agree, as does this court, that the trial court erred in sentencing defendant separately to consecutive terms of 1 year 4 months for being a felon in possession of a firearm (count 2) and for unlawful possession of ammunition (count 3).[4]

---

[4] As the People note in their respondent's brief, although defendant "did not object to the sentences below, '"[e]rrors in the applicability of section 654 are corrected

*[footnote continued on next page]*

35

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; see *People v. Correa* (2012) 54 Cal.4th 331, 336.)

The trial court erred in failing to stay defendant's sentence for count 3 (unlawful possession of ammunition) pursuant to section 654 because the ammunition at issue was either loaded into defendant's handgun or had been fired from it when defendant shot James. There is no evidence in the record that would support a reasonable finding that defendant had different or multiple objectives in possessing the loaded firearm and the ammunition in the gun itself. (*People v. Sok* (2010) 181 Cal.App.4th 88, 100; see *People v. Lopez* (2004) 119 Cal.App.4th 132, 138 [multiple punishment is precluded under section 654 for possession of a firearm and ammunition where all the ammunition is loaded into the firearm].) Defendant's sentence on count 3 must therefore be stayed under section 654.

on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal.'" (*People v. Hester*[, *supra*,] 22 Cal.4th [at p.] 295.)"

36

XI.

DISPOSITION

The judgment of conviction is affirmed, but the sentence is reversed with directions the trial court stay defendant's sentence on count 3 under section 654. On remand, the trial court is also directed to exercise its discretion regarding whether to strike defendant's nickel prior under section 1385.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


CODRINGTON
J.

We concur:


MILLER
       Acting P. J.


RAPHAEL
       J.